## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| MARION LATHEM, *et. al*., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO.: _____ |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FCA US LLC *et al.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

_____

## COMPLAINT  AND JURY TRIAL DEMAND

Plaintiffs listed and set forth herein below file this Original Complaint and Jury Trial Demand complaining of Defendants FCA US LLC, Fiat Chrysler Automobiles N.V., VM Motori S.p.A., and VM North America, Inc., Robert Bosch GmbH, and Robert Bosch, LLC and for cause of action would show.

## PARTIES

## PLAINTIFFS

1.      Plaintiff Marion Lathem is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

2.      Plaintiff Nathan Pope is a citizen of the State of Texas who acquired a 2014 Dodge RAM 1500 in the State of Texas.

3.      Plaintiff Jeremiah Brown is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

4.     Plaintiff Jerry Pettijohn is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

5.     Plaintiff Mike McCutchen is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

6.     Plaintiff Anna Codon and Scott Codon are citizens of the State of Washington who acquired a 2014 Jeep Grand Cherokee in the State of Texas.

7.     Plaintiff Claud Aldridge is a citizen of the State of Texas who acquired a 2016 dodge RAM 1500 in the State of Texas.

8.     Plaintiff Cecilio Lopez is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

9.     Plaintiff Elizabeth Lewis is a citizen of the State of Texas who acquired a 2014 Dodge RAM 1500 in the State of Texas.

10.     Plaintiff Justin Sowell is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

11.     Plaintiff Lori Gove is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

12.     Plaintiff Jason Jackson is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

13.     Plaintiff Darrell Garza is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

14.     Plaintiff Brice McManus is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

**2**

15.     Plaintiff Wanda Gloyna is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

16.     Plaintiff Jose Santos is a citizen of the State of Texas who acquired a 2014 Dodge RAM 1500 in the State of Texas.

17.     Plaintiff Jude Beaver is a citizen of the State of Texas who acquired a 2014 Dodge RAM 1500 in the State of Texas.

18.     Plaintiff Humberto Esteves is a citizen of the State of Florida who acquired a 2016 Dodge RAM 1500 in the State of Texas.

19.     Plaintiff Rodger Prince is a citizen of the State of Texas who acquired a 2015 Dodge RAM 1500 in the State of Texas.

20.     Plaintiff Douglas Hughes is a citizen of the State of California who acquired a 2016 Dodge RAM 1500 in the State of Texas.

21.     Plaintiff Robert Tarin is a citizen of the State of Texas who acquired a 2016 Dodge RAM 1500 in the State of Texas.

22.     Plaintiff Brett Baker is a citizen of the State of Texas who acquired a 2014 Dodge RAM 1500 in the State of Texas.

### The Fiat Chrysler Defendants

23.     Defendants FCA US LLC and Defendant Fiat Chrysler Automobiles N.V shall collectively be referred to as "Fiat Chrysler" for purposes of this Complaint.

24.     FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is owned by holding company Defendant Fiat Chrysler Automobiles N.V. ("Fiat"), a Dutch corporation headquartered in London, United Kingdom.  FCA was formed upon the acquisition of American automaker Chrysler by Fiat (through its Italian

corporate predecessor, Fiat S.p.A.). FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326, and it may be served with process by service upon its registered agent for service at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

25.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor Fraudulent Vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor Fraudulent Vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands.

26.     FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased two models of vehicle for which the EcoDiesel® option is available—the Ram 1500 and the Jeep Grand Cherokee—with the knowledge and intent to market, sell, and lease them in all 50 states, including in California.  Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Fraudulent Vehicles in California and throughout the United States.  Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

27.     Defendant Fiat Chrysler Automobiles N.V. ("Fiat") the corporate parent of FCA, is a Dutch corporation headquartered in London, United Kingdom. As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.  Fiat may be served with process at its London headquarters, 25 St. James's St, St. James's, London SW1A 1HA, UK

28.     Plaintiffs allege that Fiat employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Fraudulent Vehicles. Fiat also imported into the United States, sold, offered for sale, introduced into commerce, or

delivered the Fraudulent Vehicles, with the intent to market or sell them in all fifty states, including in California.

29.    Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Fraudulent Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states, including in California.  Fiat Chrysler is engaged in interstate commerce, selling Fraudulent Vehicles through its network in every state in the United States.

## The VM Motori Defendants

30.    Defendant VM North America, Inc. and Defendant VM Motori S.p.A. shall collectively be referred to as "VM Motori" for purposes of this Complaint.

31.    Fiat also owns several auto parts manufacturers, including Defendant VM Motori S.p.A. ("VM Italy"), an Italian corporation headquartered in Cento, Italy, which designs and manufactures diesel engines for automobiles, including the Fraudulent Vehicles.  Fiat partially acquired VM Italy in early 2011 by purchasing a 50% stake, and took full ownership by acquiring the remaining 50% from General Motors in October 2013.  VM Italy may be served with process at its headquarters in Italy, VM Motori S.p.A., Via della Canapa 12, 44042 Cento, Ferrara, Italia.

32.    Defendant VM North America, Inc. ("VM America") is or was a Delaware corporation and wholly-owned subsidiary of Fiat. VM America existed, at all relevant times, to support VM Italy customers and activities in North America.  VM America's principal place of business is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.  Both VM Italy and VM America conduct business at that address and report to management at both VM Italy and VM America, including while working on the Fraudulent Vehicles.  VM America may be served with

process at by service upon its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

33.   VM Italy transacts business in the United States. VM Italy employees have been physically present in Auburn Hills, Michigan, while working on engine calibration and air emissions issues related to the Fraudulent Vehicles. Some VM America employees working in Auburn Hills are also employees of VM Italy. VM Italy employees in Italy communicated regularly about the Fraudulent Vehicles with the VM America and VM Italy employees located in Auburn Hills. VM Italy also communicated frequently with FCA about the Fraudulent Vehicles.

34.   VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Fraudulent Vehicles, knowing and intending that the Fraudulent Vehicles, along with their engine system, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California.

## The Bosch Defendants

35.   Defendant Robert Bosch GmbH ("Bosch GmbH") and Defendant Robert Bosch ("Bosch LLC") shall collectively be referred to as "Bosch" for purposes of this Complaint.

36.   Defendant Robert Bosch LLC ("Bosch LLC") is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Bosch LLC may be served with process by service upon its registered agent at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.   Defendant Robert Bosch GmbH ("Bosch GmbH")—a German multinational engineering and electronics company headquartered in Gerlingen, Germany—is the parent company of Bosch LLC and may be served with process at its Principal Place of Business in the United States:  38000 Hills Tech Drive, Farmington Hills, MI 48331.

38.     Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies.

39.     The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. Bosch's sectors and divisions are grouped not by location, but by function. In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and Bosch LLC.   Regardless of whether an individual works for Bosch in Germany or the United States, the employee holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.

40.     Bosch embeds sales and engineering personnel at customer offices and facilities throughout the world, including automakers like Fiat Chrysler, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

41.     Bosch operates 70 locations in the United States, with over 31,000 employees. One of these locations is the Bosch LLC Research and Technology Center North America in Palo Alto, California.  One of Bosch's research focuses there is application-specific integrated circuit (ASIC) design and MEMS (microelectromechanical-system) technology. These technologies are used in a variety of automotive applications. Bosch LLC also operates Research and Technology Centers in Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.

42.     Bosch developed, tested, configured, manufactured, and supplied the EDC Unit 17, which is the EDC system used in the Fraudulent Vehicles, knowing and intending that the Fraudulent Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California. As set forth in detail herein, at all relevant

times, Bosch, VM Motori, and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Fraudulent Vehicles.

43.     From at least 2005 to 2015, Bosch and its employees were knowing and active participants in the creation, development, marketing, and sale of engine and emission control software designed to evade emission requirements in Fraudulent Vehicles sold in the United States. These Fraudulent Vehicles include the Ram 1500 EcoDiesel® and Jeep Grand Cherokee EcoDiesel®, as well as diesels made by other automakers such as Defendants, Audi, and Porsche.

44.     Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality. Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Fiat Chrysler and VM Motori and others to defraud regulators and consumers in the United States.

## JURISDICTION AND VENUE

45.     This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964 (RICO).  In addition, the Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

46.     This Court has personal jurisdiction over Defendants 18 U.S.C. § 1965(b) and (d). The Court also possesses pendent personal jurisdiction over Defendants.  Personal jurisdiction is further proper over Defendants because, at all relevant times, they designed, manufactured, sold, distributed, promoted and placed into the stream of commerce numerous diesel automobiles, including the automobiles at issue in this case.  In addition, the fraudulent statements and omissions occurred, in part, in this District.  Defendants also conduct business in Texas and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in

Texas.  Personal jurisdiction is proper in Texas over Defendants because they caused tortious injury by an act or omission in Texas and because they transact substantial business in Texas.

47.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, sold, and leased the Fraudulent Vehicles, and otherwise conducted extensive business, within this District.

## JURY TRIAL DEMAND

48.     Plaintiffs request a jury trial of this matter.

## FACTUAL BACKGROUND

### The Basics

49.     This lawsuit is about a fraudulent deceptive scheme to deliberately lie, cheat and intentionally deceived consumers about the characteristics, benefits and value of certain automotive Fraudulent Vehicles (referred to herein as the "Deceptive Emissions Scheme").

50.     The Deceptive Emissions Scheme involved the 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Fraudulent Vehicles") (collectively referred to as the "Fraudulent Vehicles").

51.     The centerpiece of the Deceptive Emissions Scheme was the use of, in the Fraudulent Vehicles, secretly embedded software algorithms that were designed and installed to cheat emission tests (herein referred to as the "Cheat Devices"), thereby fooling the Environmental Protection Agency ("EPA") and other regulators, into approving the Fraudulent Vehicles for sale and thereby tricking and defrauding consumers into buying and/or leasing of vehicles which were, in actuality, non-compliant and illegal to be sold or leased.

52.     As the EPA has since discovered, Chrysler concealed emission treatment software features in the Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs"). This hidden software, designed and implemented by Bosch allowed the Fraudulent Vehicles to "pass" emission testing and obtain COCs and EOs so that Fiat Chrysler could import and sell the Fraudulent Vehicles in the U.S. and California, respectively. Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Fraudulent Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by law. In short, defendant figured out a computer-driven methodology and technique to cheat the emissions system – simply run the vehicle in an eco-friendly compliant mode when being tested and in normal dirty diesel mode when it was out on the road ways being driven by consumers.  Plain and simple:  it was an intentional plan, scheme and design to lie and cheat consumers, including the Plaintiffs in this lawsuit.

53.     For years, defendants got away with the Deceptive Emissions Scheme, including the Cheat Devices, without detection as Fraudulent Vehicles were sold into our stream of commerce. Once out of the testing facilities and on the roads, these cars spewed tons of harmful NOx, far above the legal limit. All the while, the Fraudulent Vehicles were marketed to American consumers, including Plaintiffs, as "clean" diesel technology, duping thousands of environmentally-conscious consumers who were willing to pay a premium for "clean" diesel vehicles.

54.     Believing the aggressive marketing campaigns and the promises of low-emission, environmentally friendly diesel vehicles, with high fuel economy and exceptional performance, consumers, including Plaintiffs, believed the hype and acquired the Fraudulent Vehicles.  The

Deceptive Emissions Scheme was hugely successful.  Of course, at the same time – known to the defendants but not known to the unsuspecting consumers – the defendants secretly turned the most environmentally-conscious consumers into some of the biggest polluters on the road—and charged them a premium in the process.

55.     The defendants used known fraudulently obtained COCs, as well as CARB EOs, to sell and market Fraudulent Vehicles solely in the name of profit and greed.  And in trying to quench their need for such, being dishonest, fraudulent and criminal was of no deterrent value and cheating and stealing from their own consumers was of no consideration.

56.     Plaintiffs in this lawsuit were duped – plain and simple.  They got sucked in by the defendants' lies and fraudulent scheme and acquired their Fraudulent Vehicles based on the patently false representations that the vehicles were "clean" diesels with low emissions that got good gas mileage, were environmentally friendly, and complied with federal, state, and local emissions laws and regulations.

57.     All of the defendants in this lawsuit played a role and participated in the Deceptive Emissions Scheme, including the creation, use and deception related to the Cheat Devices.

58.     All of the plaintiffs in this lawsuit acquired one of the Fraudulent Vehicles without knowledge of the Deceptive Emissions Scheme or the Cheat Devices.

59.     The Deceptive Emissions Scheme, including the Cheat Devices, was dastardly.

60.     The Deceptive Emissions Scheme, including the Cheat Devices, was criminal.

61.     The Deceptive Emissions Scheme, including the Cheat Devices, was intentionally designed to defraud and cheat consumers, including plaintiffs – which it did.

**The Plot to Capitalize on the Growing "Clean" Diesel Market**

62.     For more than ten years, emissions regulations have been tightening in America. In contrast to other global automakers, like Toyota and Ford, which have focused on developing hybrid and electric cars, Fiat Chrysler took another path and focused on, among other avenues, light duty diesel.

63.     Fiat Chrysler decided to push into this market beyond its existing heavy-duty diesel trucks and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®."  These are the Fraudulent Vehicles at issue here.

64.     After the "Dieselgate" scandal involving Defendants burst into the headlines in September 2015, government agencies began to reveal that other automakers were cheating with regards to emissions and exceeding allowable emission levels under applicable standards. Nevertheless, the Defendants in this action continued with business as usual, concealing from regulators and consumers their Fraudulent Vehicles' emissions-related behavior and performance.

**The Cheat Devices**

65.     Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans.  Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards). The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued EO.

12

66. There is a very good reason that these laws and regulations exist and apply to Fraudulent Vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

67. NOx is a generic term for the mono-nitrogen oxides NO and NO2 (nitric oxide and nitrogen dioxide), which are predominantly produced from the reaction of nitrogen and oxygen gases in the air during combustion. NOx is produced by the burning of all fossil fuels, but is particularly difficult to control from the burning of diesel fuel. NOx is a toxic pollutant, which produces smog and a litany of environmental and health problems, as detailed further below.

68. Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tends to produce a more efficient vehicle. In fact, diesel engines can convert over 45% of diesel's chemical energy into useful mechanical energy, whereas gasoline engines convert only 30% of gasoline's chemical energy into mechanical energy. To make use of this dense diesel fuel, diesel engines combine high pressure to ignite a combination of diesel fuel and air through "compression ignition," as opposed gasoline engines that typically use electric discharge from a spark plug to ignite a combination of gasoline and air through "spark ignition." Though more efficient, diesel engines come with their own set of challenges, as emissions from diesel engines can include higher levels of NOx and particulate matter ("PM"), or soot than emissions from gasoline engines due to the different ways the different fuels combust and the different ways the resulting emissions are treated following combustion. One way NOx emissions can be reduced by adjusting the compression and temperature, but that in turn produces PM, a similarly-undesirable hydrocarbon-based emission. Another way NOx emissions can be reduced is through expensive exhaust gas after treatment devices, primarily, catalytic converters, that use a series of chemical reactions to transform the chemical composition of a vehicle's NOx emissions

into less harmful, relatively inert, and triple bonded nitrogen gas (N2; just over 78% of the Earth's atmosphere by volume consists of N2) and carbon dioxide (CO2).

69.     Diesel engines thus operate according to this trade-off between price, NOx and PM, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce both low PM and low NOx. In 2000, the EPA announced stricter emission standards requiring all diesel models starting in 2007 to produce drastically less NOx than years prior.

70.     Fiat Chrysler's response to this challenge was the EcoDiesel® engine.  Emission reductions start in the cylinder with advanced fuel injection strategies. After the byproducts of combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and SCR.

71.     The Fraudulent Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions.  Bosch GmbH and Bosch LLC designed, tested, customized, manufactured, and sold these EDC systems, including software code, to Fiat Chrysler (along with other automakers including Defendants, Mercedes, and General Motors) for use in the Fraudulent Vehicles.

72.     The system used in the Fraudulent Vehicles is Bosch's EDC Unit 17 (also called "EDC17"). A February 28, 2006 Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, Bosch touted the EDC17 as follows:

**EDC17: Ready for future demands**
Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.

73.     Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal. Sensor readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.

74.     In 2010 or 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans. This engine had been under development for use in a General Motors automobile for the European market. However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in the Fraudulent Vehicles to be sold in the United States.

75.     VM Motori is deeply involved in the development and testing of all aspects of the engine, including the engines of the Fraudulent Vehicles.

76.     The engine for the Fraudulent Vehicles was originally developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in

the United States. Rather than make the engine compliant with U.S. emissions standards, however, Defendants opted to cheat.

77.     In January 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel®. As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."  Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee would be assembled at Bosch's facility in Kentwood, Michigan.

78.     In reality, Fiat Chrysler—working with VM Motori on the design of the EcoDiesel®'s engines and Bosch on the design of the EDC Unit 17—was either unable or unwilling to devise a solution within the constraints of the law. And so, like their rivals at Defendants, they devised one outside of it. Instead of cutting their losses on "EcoDiesel," delaying the production of the Fraudulent Vehicles, or coming clean, Fiat Chrysler worked closely with VM Motori and Bosch to customize the EDC Unit 17 to allow Fraudulent Vehicles to simulate "passing" the EPA and CARB testing. Unlike during testing, the software disables or restricts certain of the emission controls during real-world driving conditions. When the emission controls are de-activated on the road, the Fraudulent Vehicles emit up to 20 times the legal limits of NOx.

79.     These software controls designed and implemented by Bosch were concealed from regulators on COC and EO applications for the Fraudulent Vehicles, thus deceiving the EPA and CARB into approving the Fraudulent Vehicles for sale throughout the United States and

16

California. Of course, consumers like Plaintiffs who had no way of discerning that the emission control technology de-activated during real-world driving conditions, were likewise deceived.

80.     Bosch worked closely with Fiat Chrysler and VM Motori to develop and implement a specific set of software algorithms for implementation in the Fraudulent Vehicles, which enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates.

81.     A study recently published by researchers at the University of California, San Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that Bosch code was used in a so-called defeat device for a Fiat vehicle. The study described the software as setting one mode for when a vehicle is being tested for emissions, but then allowing tailpipe pollution to spike in real-world driving conditions. The study described Bosch's role in building the electronic control unit ("ECU") hardware and developing the software running on the ECU and found there was "no evidence that automobile manufacturers write any of the code running on the ECU."   To the contrary:  "All code we analyzed in this work was documented in documents copyrighted by Bosch and identified automakers as the intended customers."  The study concluded: "We find strong evidence that both defeat devices were created by Bosch and then enabled by Defendants and Fiat for their respective Fraudulent Vehicles."

82.     When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform a series of specific maneuvers prescribed by federal regulations to simulate driving and test emissions in a controlled environment.   Bosch's EDC Unit 17 gave Fiat Chrysler the ability to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. For example, given that the steering wheel cannot be turned on a

dynamometer, Bosch programmed a sensor which detected whether or not the steering wheel turned. When the EDC Unit 17's detection algorithm detected an emission test was complete, the EDC Unit 17 could de-activate or reduce the emission control systems' performance, causing the vehicle to spew illegal amounts of NOx emissions when out on the road.

83.     This workaround was illegal.  The CAA expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use."  40 C.F.R. § 86.1803-01; see also id. § 86.1809-10 ("No new light- duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

84.     As the EPA has now alleged in its Notice of Violation against Fiat Chrysler, Defendants did not disclose, and affirmatively concealed, the presence of performance-altering software code developed with Bosch from government regulators. In other words, Defendants lied to the government, its customers, its dealers, and the public at large.

85.     Because FCA lied on the COC and EO applications, these COCs and EOs were fraudulently obtained. And because the Fraudulent Vehicles did not conform "in all material respects" to the specifications provided in the COC and EO applications, the Fraudulent Vehicles were never covered by a valid COC or EO, and thus were never legal for sale—nor were they EPA

and/or CARB compliant, as represented. With the complicity of Bosch and VM Motori, Fiat Chrysler hid these facts from the EPA, CARB, and other regulators, and consumers like Plaintiffs, and continued to sell and lease the Fraudulent Vehicles to the driving public, despite their illegality.

86.     This illegal workaround was enabled by a close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Fraudulent Vehicles and other "clean" diesel Fraudulent Vehicles.  Bosch was aware that Fiat Chrysler used its emission control technology as a concealed auxiliary (or defeat) device and, in fact, worked together with Fiat Chrysler and VM Motori to develop and implement software algorithms specifically tailored to allow the Fraudulent Vehicles to evade detection.

87.     Bosch worked closely with Fiat Chrysler and VM Motori to create specifications and software code for each Fraudulent Vehicle model. Indeed, customizing a road-ready ECU is an intensive three- to five-year endeavor involving a full-time Bosch presence at an automaker's facility. VM Motori likewise worked closely with Bosch and Fiat Chrysler in designing, installing, and calibrating the engines for the Fraudulent Vehicles.

88.     All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Fiat Chrysler and VM Motori, from making significant changes on their own.  Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

89.     Bosch's security measures further confirm that its customers cannot make significant changes to Bosch software without their involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning

that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch's knowing participation.

90.     Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them.  As they did with Defendants, the units required the work of numerous Bosch coders for a period of more than ten years.  Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.

91.     Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating.  In 2007, Bosch warned Defendants, another user of its cheat devices, that using the emission-altering software in production Fraudulent Vehicles would constitute an "offense."  Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicle, including the Fraudulent Vehicles, from U.S. regulators and consumers.

92.     Bosch LLC worked closely with Bosch GmbH and diesel automakers both in the United States and in Germany, to ensure that the "clean" diesels, like the Fraudulent Vehicles, passed emission testing. Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel Fraudulent Vehicles were approved for sale in the United States. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from regulators in the United States about those Fraudulent Vehicles. On information and belief, Bosch LLC also assisted in concealing the true nature of the emission control technology from regulators in the United States with respect to the Fraudulent Vehicles at issue here.

93.     Bosch not only kept the dirty secret safe, it went a step further and actively lobbied lawmakers to push "clean diesel" in the United States. As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 emission standards

in the United States.    Bosch engaged in a multi-year, multi-million dollar effort involving key players from Bosch in both Germany and the United States. In its efforts to promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its global group of affiliated companies, including Bosch LLC.

94.    Bosch's promotion of diesel technology specifically targeted the United States. For example, Bosch put on "Diesel Days in California" and "SAE World Congress in Detroit."   In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends, and to engage in a vital dialogue with industry leaders and policymakers."

95.    Bosch LLC hosted multi-day conferences open to regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean" diesel technology, including the calibrations necessary for the vehicles to comply with emission regulations.

96.    In April 2009, for example, Bosch organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators, and non-governmental organizations with the aim of changing perceptions of diesel from "dirty" to "clean." The event featured "clean diesel" vehicles as ambassadors of "clean diesel" technology. The stated goals were to "build support for light-duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives."

97.    Bosch also joined in events promoting the Fraudulent Vehicles. At one such event hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements regarding the 3.0-liter EcoDiesel V6's performance.  It stated that the "Bosch emissions control

system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy that is "30% better than a comparable gasoline engine."

98.     In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.  One of this advocacy group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."   This group lobbies Congress, U.S. regulators, and CARB in connection with rules affecting "clean diesel" technology.

### The Misleading Advertising Campaign

99.     To counter consumer perception that diesel engines produce "dirty" emissions and to capitalize on consumers' desire to protect the environment and to save fuel costs, FCA aggressively markets the EcoDiesel® engine as being environmentally friendly, using a leaf and green coloring in its logo.  In fact, the central theme in FCA's diesel engine marketing is the promise of "clean" diesel.

100.     In its EcoDiesel® advertising, FCA specifically targets consumers "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance." Indeed, it claims that the Ram 1500 was "the NAFTA market's first and only light-duty pickup powered by clean diesel technology."

101.     To convince these consumers, FCA markets the Fraudulent Vehicles as EcoDiesel® Fraudulent Vehicles, with EPA certifications throughout the United States, claiming throughout its advertising, specifications, and public-facing statements:

- "Thanks to advanced emissions-control technology … [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."

- "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel® V6 engine will be emissions- compliant in all 50 states."

- "Chrysler Group engineers adapted the engine—manufactured by Fiat-owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations. The new EcoDiesel® V-6 is Tier 2/Bin 5 compliant."

- The emissions on the EcoDiesel® engine data sheet meet Tier 2/Bin 5 requirements.

102.     FCA further claims that "the Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."

103.     FCA goes so far as to hold itself out as a protector of the environment: "We are in a race against time. Climate change and the increasing scarcity of traditional sources of energy require new approaches to mobility. Fiat Group is addressing this challenge head-on by ensuring individual freedom of movement with maximum consideration for the environment and local communities."  Step one, according to FCA, is to "minimize environmental impacts related to the use of our products."

104.     FCA also claims that the EcoDiesel® engines equip the Ram 1500 with the "best fuel economy of any full-size pick-up" and the Jeep Grand Cherokee "with an incredible 730-mile highway driving range, you can find hundreds of miles of discovered roads and be confident you'll find your way back." The claim concerning Ram 1500's "fuel economy" was featured on FCA's website and thus sent across the interstate wires.

105. FCA goes even further, offering prospective Ram 1500 buyers a calculator to determine how much money they can save with "fewer fill-ups day-by-day" due to "the best fuel economy."

106. FCA's Jeep Grand Cherokee advertising claims that diesel technology reduces the number of fill-ups for consumers:

107. Another theme of FCA's misleading advertising campaign is the Fraudulent Vehicles' power, including torque and towing capacity. FCA claims that the 2015 Jeep Grand Cherokee equipped with a 3.0-liter EcoDiesel V6 engine has best-in-class towing capability of up to 7,400 pounds. Similarly, FCA claims that the EcoDiesel® engine has best-in-class torque: "The EcoDiesel® engine delivers best-in-class 420 lb-ft of torque. Paired with an impressive 240 horsepower, this engine has serious muscle."

108. FCA could not achieve the promised fuel economy and/or towing power for the Fraudulent Vehicles at issue without de-activating or reducing the emission control system during real-world driving conditions. If and when FCA recalls the Fraudulent Vehicles and/or provides a "fix" that results in decreasing the EcoDiesel® engine performance to bring them into compliance, Plaintiffs will be required to spend additional sums on fuel and will not retain the promised towing power. And the Fraudulent Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their engines.

### "Dieselgate" Scandalizes The Global Auto Industry.

109. The world was shocked to learn that Defendants had manufactured over 11 million diesel cars that were on the roads in violation of European emission standards, and over 565,000

vehicles operating in the United States in violation of EPA and state emission standards. But Defendants was not the only one.

110.    In the wake of the Defendants "defeat device" scandal, scientific literature and reports and testing indicate that many other so-called "clean diesel" vehicles emit far more pollution on the road than in lab tests. The EPA has since widened its probe of diesel emissions to include the Fraudulent Vehicles at issue here.

111.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers, when tested, emitted significantly more NOx on real-world trips but nevertheless passed laboratory tests. The report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."

112.    The report further remarked:

It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice.  In other words:  ***In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions.***

The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel" advertising, including that for the Fraudulent Vehicles at issue here.

113.    Other organizations are beginning to take notice of the emission deception. The Transportation and Environment ("T&E") organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe." T&E stated in September 2015 that real-world emission testing showed drastic differences from laboratory tests, such that models tested emitted more pollutants on the road than in the lab. "For

virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.

114.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results," because manufacturers like Fiat Chrysler can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions.

115.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles." With regard to its recent on-road emission testing, the company explains:

[I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures.  For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found.

**The EPA Issues A Notice Of Violation to Fiat and FCA.**

116.    On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the 2014-2016 FCA Ram 1500s and Jeep Grand Cherokees. In the NOV, the EPA explained that, despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"

117.    The same day, CARB publicly announced that it, too, had notified Fiat and FCA of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee and

Ram 1500 EcoDiesel® vehicles. CARB also said Fiat and FCA failed to disclose the devices, which can significantly increase NOx emissions when activated. "Once again," observed CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules and got caught."

118.    The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties. As the U.S. has found, "one or more of these undisclosed software features, alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests."

119.    The EPA's NOV and lawsuit arose in part from emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory.  The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device."

120.    The EPA identified at least eight AECDs in the Fraudulent Vehicles that were concealed on COC applications:

- AECD 1 (Full EGR Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

121.    The EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use."  The EPA further found that Fiat and FCA did not disclose or justify these control devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce, or imported one of the approximately 103,828 Fraudulent Vehicles.

**Bosch Software Documentation Further Verifies the Cheating**

122.    Researchers have obtained Bosch software documentation describing the functions, modules, structure, variables and calibration parameters believed to be installed in the Fraudulent Vehicles. The documentation is over 10,000 pages long and contains hundreds of functions and thousands of variables developed by Bosch that describe the operation of the engine. These parameters and functions correlate with many of the violations alleged by the EPA and CARB. Critically, these functions, designed and implemented by Bosch, have elements that have no legitimate purpose in normal use.  At the same time, these same elements, when enabled, allow the functions to reduce the effectiveness of emission controls in real world driving conditions, but not during an emission test cycle.

a.    **AECDs 1 and 2:   Reducing or Disabling EGR at Highway Speeds**

123.    The   function   named   "AirCtl_RatDesValCalc"   described   in   the   Bosch documentation as "Exhaust gas recirculation control - EGR ratio setpoint calculation" is used to calculate the desired EGR rate. The software documentation contains figures with flow diagrams describing the inputs, outputs, and calculation performed by this software function. Bosch has

included vehicle speed as an input used by the EGR control function to modify the EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate reason for the EGR rate to depend directly on vehicle speed.

124.    By allowing EGR rate to depend directly on vehicle speed, Bosch provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use. This function may be, and is likely to have been, used to implement the undisclosed AECDs 1 and 2 identified in the EPA NOV to Fiat and FCA.

### b.    AECD 3: EGR Shut-Off for Exhaust Valve Cleaning

125.    AECD 3 identified in the EPA NOV has also been identified in Bosch's software documentation in the function named "AirCtl_Mon" described in the Bosch documentation as "Exhaust gas recirculation control – Monitoring and shut-off." Bosch described this AECD as ostensibly providing a cleaning mechanism for the engine exhaust valves when the Vehicle is in overrun (i.e., the engine is turning without combustion, such as when the vehicle is going downhill). To accomplish this cleaning, the function created by Bosch closes the EGR valve (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch also programmed a software switch (named "AirCtl_swtOvrRunOff_C") that allowed Fiat and FCA to enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

126.    Together    with    an    activation    delay    added    by    Bosch—controlled    by AirCtl_tiEngRunDrvCycMin_C, which is described as "Calibration time after which exhaust valve cleaning routine can start"—the AirCrl_Mon function can be readily used as a defeat device. To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun (AirCtl_swtOvrRunOff_C = TRUE), but only after the duration of a typical emission test cycle

(AirCtl_tiEngRunDrvCycMin_C = 1800 seconds).  This would disable EGR after an emission test cycle, resulting in increased NOx emission. This function may be, and is likely to have been, used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

### c.    AECD 7: Alternative SCR Dosing Modes

127.    Bosch included a timer in another function, without a legitimate purpose. The Bosch function named "SCRFFC_Main," described in documentation as "Calculation of the NH3 precontrol quantity" has an input variable timer entitled "CoEng_tiNormal," which holds the time duration since the engine was started. This variable can be used to reduce SCR efficiency, and, therefore, increase NOx emission, after a certain time has elapsed. In particular, this timer may be set to the duration of a typical emission test cycle. There is no legitimate reason for SCR to depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world driving conditions. This function may be, and is likely to have been, used to implement undisclosed AECD 7 identified in the EPA and CARB NOVs.

### **West Virginia University Testing of the Fraudulent Vehicles Confirms the Cheating**

128.    Beginning in 2015, researchers at the West Virginia University Center for Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering Defendants' fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA.  The test comprised the vehicles at issue here: Jeep Grand Cherokees and Ram 1500 diesel vehicles, all equipped with the 3.0L EcoDiesel® engine, and featuring SCR NOx after-treatment technology.

129.    All test vehicles were evaluated on a vehicle chassis dynamometer representing the test conditions for regulatory compliance. Each vehicle was also tested over-the-road using a

PEMS device during a variety of driving conditions including urban/suburban and highway driving.

130.    One of the Jeep Grand Cherokees and one of the Ram 1500 Fraudulent Vehicles was tested prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which included a software "reflash" by FCA that concerned the Fraudulent Vehicles' emission control systems.

131.    Results indicated that both Jeep Grand Cherokee and Ram 1500 in MY 2014 exhibited significantly increased NOx emissions during on-road operation as compared to the results observed through testing on the chassis dynamometer. For MY 2015, Jeep vehicles produced from 4 to 8 times more NOx emissions during urban/rural on-road operation than the certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx permitted by EPA Tier 2/Bin 5 standard for highway driving conditions.

132.    The researchers noted that for the Fraudulent Vehicles tested post-recall using the dynamometer, NOx emissions were similar or slightly lower than that observed for Fraudulent Vehicles tested pre-recall. But on-road emissions were still very different from emissions observed through chassis dynamometer testing, even though they were slightly improved from the levels observed during pre-recall testing.

**European Investigation and Testing Confirms the Cheating**

133.    Fiat Chrysler and Bosch have both found themselves in trouble with German regulators in the wake of the Defendants scandal.

134.    German prosecutors have launched an investigation into Bosch, reportedly raiding Bosch's offices in Stuttgart.   In April 2016, Bosch GmbH representatives met with Germany's Federal Motor Transport Authority ("KBA") on at least two occasions. In an April 14, 2016

meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control units provided to Fiat Chrysler for diesel vehicles sold in Europe.  Bosch confirmed that it had delivered the control units for the vehicles as well as the associated software and that Bosch employees had integrated the emission-related applications into the software. Bosch admitted that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after an elapsed period of driving time or number of cycles.  Specifically, 22 minutes after the start of the engine (the estimated duration of emission testing), the software reduced the EGR rate to nearly zero and de-activated NSC regeneration. Another trigger for de-activation of the NSC regeneration occurred after the vehicle had been driven a distance of 100 kilometers. Bosch confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5. The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles and Bosch shared responsibility for the defeat device with Fiat Chrysler. Media reports have confirmed the same.

135.    After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time, causing the Vehicles to emit more than 10 times the legal limit of NOx. The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes. As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models."   In August 2016, the German government formally concluded that Fiat Fraudulent Vehicles sold in the EU had used defeat devices. Further states confirm the cheating.

136.    The testing of European regulators has been confirmed by independent testing conducted here in the United States. A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage

catalyst regeneration. Unlike the Defendants' defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started. (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

137.   According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle. The researchers obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of conditions using the terms "during homologation cycle" and "during real driving." The term "homologation" is commonly used in Europe to describe the process of testing an automobile for regulatory conformance.  Bosch's authorship of the document and use of the terms "homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate that it not only created the mechanism for Fiat Chrysler but was also aware of the mechanism's intended purpose of circumventing emission testing.

138.   Together, these facts reveal that Defendants have fraudulently concealed the functions of its emission control technology from regulators and consumers alike. Further, they demonstrate that Fiat Chrysler's claims about its EcoDiesel® Fraudulent Vehicles as "clean diesel" with "ultralow emissions" and "no NOx" emitted through the tailpipe is false and misleading.

### Publicly Revealed Testing Confirms the Cheating

139.   Recently, testing of the Fraudulent Vehicles by private parties has been made public in court filings.  This testing confirms the existence and functionality of the Cheat Devices.

140.   In late 2016, testing of a 2015 Ram 1500 pickup using a Portable Emissions Measurement System ("PEMS") that Fiat Chrysler had cheated in that it had concealed the fact

that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

141.    In separate testing, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road.   In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS.   The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (i.e., in the laboratory). On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times.  When tested on a highway, the average NOx emissions measured 35 times the EPA Tier 2 Bin 5 standard.

**The Deceptive Emissions Scheme Caused Extensive Harm to Plaintiffs.**

142.    The Deceptive Emissions Scheme duped Plaintiffs and consumers into acquiring Fraudulent Vehicles that never should have left the factory, let alone been sold, at a cost of billions of dollars.

143.    In addition, a premium was charged for the Fraudulent Vehicles, as compared to non-diesel vehicles.  Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline Fraudulent Vehicles.   In return, Defendants promised power, performance, fuel economy, and environmental friendliness (and Fraudulent Vehicles that were legal to drive). Defendants could not deliver on that promise. Plaintiffs suffered significant harm as a result.

144.     The Fraudulent Vehicles are, in fact, now virtually unsellable or sellable at a vastly reduced value. With the revelations of Defendants' fraud, the Fraudulent Vehicles have decreased sharply in value.

145.     Plaintiffs acquired their Fraudulent Vehicles based Defendants' fraudulently obtained COCs from the EPA to induce Plaintiffs to buy or lease these vehicles. In addition, Defendants engaged in a false and misleading advertising campaign that the "clean" diesel engine system was an environmentally friendly, fuel efficient, and low emission vehicle with high performance. Plaintiffs acquired the Fraudulent Vehicles based on these claims, and were harmed as the cars were neither legal nor clean.

146.     If Defendants are not be able to bring the Fraudulent Vehicles into compliance with emissions standards, then the Fraudulent Vehicles will have to be removed from the road.

147.     Defendants cannot fix the Fraudulent Vehicles without degrading their performance, including horsepower and/or efficiency. Plaintiffs have suffered actual harm and damages because their vehicles will no longer perform as promised. This will necessarily result in a diminution in value of the Fraudulent Vehicles.  Moreover, Plaintiffs will not possess the Fraudulent Vehicles they thought they acquired and will not have received the benefit of the bargain for all the years they owned and/or leased the Fraudulent Vehicles that could not and did not deliver all of the characteristics for which they paid a premium, and were not compliant with U.S. law.

148.      This will also result in a diminution in value of every Fraudulent Vehicle, and it will cause owners and lessees of Fraudulent Vehicles to pay more for the use of their Fraudulent Vehicles.

149.    If Plaintiffs had known the true facts, Plaintiffs would not have acquired the Fraudulent Vehicles (in fact, they could not have legally been sold), or would have paid substantially less for them.

150.    The harm described herein is quantifiable and ongoing. As a result of Defendants' illegal scheme, owners and lessees of the Fraudulent Vehicles, including Plaintiffs, have suffered losses—and continue to lose—money and property.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

151.    The tolling doctrine was made for cases of fraudulent concealment like this one. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that the defendants had conspired to install software that would evade emissions regulations, and that the defendants were concealing and misrepresenting the true emissions levels of its vehicles.

152.    The fraud, as set forth herein, was elaborate and well concealed. Indeed, the EPA and CARB uncovered the software manipulation only through a sophisticated and costly investigation involving highly technical equipment.

153.    Plaintiffs had no realistic ability to discover the presence of the defeat devices, or to otherwise learn of the fraud, until it was discovered by the EPA and CARB and revealed to the public through their respective Notices of Violation.

154.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

**Fraudulent Concealment**

155.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

156.    Defendants have known of the emission control software installed in the Fraudulent Vehicles since at least 2014, when Defendants began installing them. Since then Defendants have intentionally concealed from, or failed to notify, regulators, Plaintiffs and the driving public of the undisclosed Cheat Devices and the true level of emissions and performance of the Fraudulent Vehicles.  There is no question that the Cheat Devices were installed to intentionally deceive regulators, and the public.

157.    Despite knowing about the Cheat Devices and the unlawful emissions during real-world driving conditions, Defendants did not acknowledge the problem, even after the EPA and CARB issued their Notices of Violation. Even to the present day, Defendants have denied any wrongdoing.

158.    Any otherwise-applicable statutes of limitation have therefore been tolled by the knowledge and active concealment of the facts by the defendants as alleged herein.

**Estoppel**

159.    Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the Fraudulent Vehicles, including its emissions system and its compliance with applicable federal and state law. Instead, they have actively concealed the true character, quality, and nature of the Fraudulent Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Fraudulent Vehicles.

160.    Plaintiffs reasonably relied upon the knowing and affirmative misrepresentations and/or active concealment of these facts.

161.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action

### American Pipe Tolling

162.    Under the U.S. Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny, any applicable statutes of limitation were tolled by the filing of the federal class action complaint in *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales, Practices, and Products Liability Litigation*; 3:15-md-02777-EMC(N.D. Cal.).

### CLAIMS FOR RELIEF

### FEDERAL CLAIMS

### FEDERAL COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### Violation of 18 U.S.C. § 1962(c)-(d)
### (On behalf of all Plaintiffs)

163.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

164.    Plaintiffs bring this action against all Defendants.

165.    For purpose of this Count, Defendants are referred to as the "RICO Defendants".

166.    Fiat conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, like FCA, VM Italy, and VM America, each of which is a separate legal entity. The Bosch Group also conducts its business, both legitimate and illegitimate, through hundreds of companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC.  At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

167.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

168.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

169.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler.  In November of that year, CEO Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel variants" of Jeep and to give Ram "Light duty (1500)" a "refresh/facelift."

170.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a longtime supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies.  In May of that year, Marchionne announced another five-year plan at Auburn Hills, Michigan headquarters to increase Fiat Chrysler's competitiveness against global auto behemoths, such as Toyota, Defendants, and General Motors, by increasing annual sales to 7 million vehicles by 2018, up from 4.4 million in 2013.  Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel engines."

171.    During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path and focused more heavily on light-duty diesels and compressed natural gas.

172.    As it turned out, however, Fiat Chrysler was either unable or unwilling to devise a solution within the constraints of the law. And so, like Defendants, they devised one outside of it. Instead of cutting their losses, holding up the Fraudulent Vehicle roll outs, or coming clean, they

conspired with VM Italy and VM America and Bosch GmbH and Bosch LLC to install customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel controls so that the Fraudulent Vehicles could "pass" the EPA and CARB testing. The software disabled or restricted certain of the emission controls during real-world driving conditions, however, causing the Vehicles to spew up to 25 times the legal limits of NOx. These software controls were concealed from regulators on COC and EO applications for the Vehicles by FCA, thus deceiving the EPA and CARB into approving the Fraudulent Vehicles for sale throughout the United States and California.

173. To accomplish their scheme or common course of conduct, Fiat, FCA, VM Italy, VM America, Bosch GmbH, and Bosch LLC, along with others, had to work together to conceal the truth. Each defendant was employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "EcoDiesel® RICO Enterprise"). The purpose of the EcoDiesel® RICO Enterprise was to deceive regulators into believing that the Fraudulent Vehicles were eligible for coverage by a COC and/or EO and compliant with emission standards. The motivation was simple: to increase Defendants' revenues and profits and minimize their losses from the design, manufacture, distribution and sale of the Fraudulent Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants were able to extract over a billion dollars from consumers. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

**A.    Description of the EcoDiesel® RICO Enterprise**

174. In an effort to expand its market share in the United States and beyond, Fiat, a publicly-traded Italian-controlled, Dutch-registered company headquartered in London, bought

then-Chrysler (now FCA), a separate Delaware company, headquartered in Michigan. Fiat uses FCA to design, market, manufacture and sell the Fraudulent Vehicles and other vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands throughout the United States. FCA also submitted the COC and EO applications for the Fraudulent Vehicles.  Fiat used VM Italy and VM America to design and manufacture the EcoDiesel® engines for the Fraudulent Vehicles, which were calibrated in Michigan with Bosch's hidden software.  Fiat, FCA, VM Italy, and VM America maintained tight control over the design, manufacture, calibration, and testing of the Vehicles. Bosch also participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, writing the software code customized for the Fraudulent Vehicles, and concealing the hidden software installed in the Fraudulent Vehicles in order to allow them to "pass" testing but then disable or restrict certain emission controls during real-world driving conditions.

175.   At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, calibration, manufacture, testing, marketing, and sale of the Fraudulent Vehicles or the emission controls therein, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to sell the Fraudulent Vehicles throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4). The enterprise is called the "EcoDiesel® RICO Enterprise."

176.   At all relevant times, the EcoDiesel® RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961 (4), as legal entities as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the RICO Defendants' unlawful profit-making scheme.

177.    The association-in-fact EcoDiesel® RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1.    The Fiat Chrysler Defendants

178.    Fiat Chrysler is the seventh-largest automaker in the world based on total annual vehicle sales and is an international automotive group. Fiat is listed on the New York Stock Exchange under the symbol "FCAU" and on the Mercato Telematico Azionario under the symbol "FCA."  FCA is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of Delaware. FCA is a distinct legal entity, controlled and owned (indirectly) by Defendant Fiat. FCA's day-to-day operations are managed by employees of both Fiat and FCA. Fiat's Group Executive Committee are based in FCA's Michigan headquarters.  Fiat and FCA worked closely with VM Italy and VM America to develop and calibrate the EcoDiesel® engines for the Fraudulent Vehicles and to gather information for submission to regulators in the COC and EO applications by FCA. Each of these Defendants knew or recklessly disregarded that the Fraudulent Vehicles were unable to (and did not) comply with U.S. emission standards and yet concealed this information from regulators.

179.    Working with other members of the EcoDiesel® RICO Enterprise, Fiat and FCA conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards.   Employing this technology, Fiat Chrysler fraudulently obtained COCs and EOs for the Fraudulent Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions. Further, they concealed this information from regulators once questions were raised.

### 2.      The VM Motori Defendants

180.    As explained above, Fiat bought 50% of VM Italy in 2011 and the remaining 50% stake from General Motors in 2013. Fiat Chrysler used VM Italy and VM America to design, calibrate, and manufacture the EcoDiesel® engine to be used in the Fraudulent Vehicles. Fiat and FCA worked with, and oversaw, VM Italy and VM America in the development and calibration of the engines at Michigan headquarters.  Employees from VM Italy and VM America worked jointly on the manufacturing and/or assembling the engines for the Vehicles in the United States. And VM Italy and VM America performed engine calibrations, including calibrations involving the concealed emission control technology for the Vehicles. For example, VM Motori's Calibration Leader for the Vehicles was based in Michigan and reported to management at both VM Italy and VM America.  Finally, VM Italy and VM America provided information to FCA for inclusion in the COC and EO applications. VM Italy and VM America knew or recklessly disregarded that the EcoDiesel® engines in the Fraudulent Vehicles were unable to comply with U.S. emission standards and yet concealed this information from regulators.

### 3.      The Bosch Defendants

181.    As explained above, the Bosch Defendants supplied the emission control technology at issue—EDC Unit 17s—which were installed in the Fraudulent Vehicles. Bosch GmbH is a multinational engineering and electronics company headquartered in Germany, which has hundreds of subsidiaries and companies, including in the United States.  It wholly owns Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. Bosch's sectors and divisions are grouped by subject matter, not location. Mobility Solutions is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of both

Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the EDC units for the Fraudulent Vehicles.

182. Bosch's relationship with key corporate partners, such as Fiat, which brought in millions of dollars in annual revenue for Bosch.

183. Bosch worked with Fiat and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions. Bosch was well aware that the EDC Unit 17 would be used for this purpose. Bosch was also critical to the concealment of these software functions in communications with regulators.

**B.    The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues.**

184. The EcoDiesel® RICO Enterprise began as early as 2009, when Fiat began to acquire FCA and later VM Motori. Fiat Chrysler and Bosch entered into an agreement to develop and install EDC Unit 17's into over a hundred thousand Fraudulent Vehicles sold in the United States. It was not until September 2015 that the scheme began to unravel, when U.S. regulators uncovered Defendants' defeat devices provided by Bosch and questions were raised as to whether other diesel automakers were cheating, too.

185. At all relevant times, the EcoDiesel® RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Fiat and FCA, their network of dealerships, VM Italy, VM America, Bosch GmbH, Bosch LLC, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Fraudulent Vehicles to consumers, including Plaintiffs, through fraudulent COCs and

EOs, false emissions tests, false or misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the EcoDiesel® RICO Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Plaintiffs nationwide.

186.    The EcoDiesel® RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain concealed AECDs. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Vehicles.

187.    The EcoDiesel® RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Vehicles throughout the country, and the receipt of monies from the sale of the same.

188.    Within the EcoDiesel® RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Fraudulent Vehicles to the general public nationwide.

189.    Each participant in the EcoDiesel® RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the EcoDiesel® RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

45

190.    The RICO Defendants participated in the operation and management of the EcoDiesel® Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

191.    Fiat and FCA exerted substantial control over the EcoDiesel® RICO Enterprise, and participated in the affairs of the Enterprise, by:

A.      installing emission control software that deactivates or restricts one or more of the controls during real-world driving conditions;

B.      concealing these software functions from regulators;

C.      failing to correct or disable the hidden software when warned;

D.      manufacturing, distributing, and selling the Fraudulent Vehicles that emitted greater pollution than allowable under the applicable regulations;

E.      misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

F.      introducing the Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

G.      concealing the existence of the emission controls and the unlawfully high emissions from regulators and the public;

H.      persisting in the manufacturing, distribution, and sale of the Vehicles even after questions were raised about the emission testing and discrepancies concerning the same;

I.      misleading government regulators as to the nature of the emission control technology and the defects in the Fraudulent Vehicles;

J.      misleading the driving public as to the nature of the emission control technology and the defects in the Fraudulent Vehicles;

K.      designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

L.      otherwise misrepresenting or concealing the defective nature of the Fraudulent Vehicles from the public and regulators;

N.      collecting revenues and profits from the sale of such products; and/or

O.      ensuring that the other RICO Defendants and unnamed co-conspirators complied with the scheme or common course of conduct.

192.    VM Italy and VM America also participated in, operated and/or directed the EcoDiesel RICO Enterprise by developing an engine that emits high levels of toxic pollutants, calibrating the emission controls to deactivate or diminish during real-world driving conditions, and providing false or misleading information for purposes of supplying it to regulators on COC and/or EO applications.

193.    Bosch GmbH and Bosch LLC also participated in, operated and/or directed the EcoDiesel® RICO Enterprise.   Bosch formed a partnership with Fiat to provide engine management and emission control technology for the Fraudulent Vehicles. Bosch GmbH and Bosch LLC participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 for the Vehicles.  Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects of the software and closely collaborated with Fiat, FCA, VM Italy, and VM America to develop, customize, and calibrate the software for the Vehicles.

47

Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the other RICO Defendants to ensure that the EDC Unit 17 was fully integrated into the Vehicles. Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators and actively lobbying regulators on behalf of "clean diesel." Bosch collected millions of dollars in revenues and profits from the hidden software installed in the Vehicles.

194.    Without the RICO Defendants' willing participation, including Bosch GmbH and Bosch LLC's active involvement in developing and supplying the critical emission control software for the Vehicles, the Enterprise's scheme and common course of conduct would have been unsuccessful.

195.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the RICO Defendants' or other's hands.

196.    Similarly, because the defendants often refer to themselves as a group (i.e., "Bosch" rather than "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the full extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

**C.    Mail and Wire Fraud**

197.    To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the EcoDiesel® RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

198.     Specifically, as alleged herein, the RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.  The multiple acts of racketeering activity that the RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."   The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the EcoDiesel® RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

199.     The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

200.     In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.  For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

201.     The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A.     Mail Fraud:  The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate

**49**

carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Fraudulent Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

B.      Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

202.    The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.      the Fraudulent Vehicles themselves;

B.      component parts for the EcoDiesel® engines;

C.      component parts for the Bosch emission control hardware and software;

D.      false or misleading emission test results;

E.      applications for EPA COCs and CARB EOs that concealed AECDs;

F.      fraudulently-obtained EPA COCs and CARB EOs;

G.      vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

H.      documents and communications that facilitated "passing" emission tests;

I.      false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emission controls and/or AECDs;

J.      sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Fraudulent Vehicles;

50

K.      documents intended to facilitate the manufacture and sale of the Fraudulent Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.      documents to process and receive payment for the Fraudulent Vehicles by unsuspecting Plaintiffs, including invoices and receipts;

M.      payments to VM Italy and VM America;

N.      payments to Bosch GmbH and Bosch LLC;

O.      deposits of proceeds; and/or

P.      other documents and things, including electronic communications.

203.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Fraudulent Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
| --- | --- | --- | --- |
| FCA | Bosch LLC | January 2013 | Documents related to agreement to purchase Bosch EDC Unit 17 for 2014 Jeep Grand Cherokee. |
| VM Motori | FCA | January 2013 | Documents related to Eco Diesel engine for 2014 Jeep Grand Cherokee. |
| FCA, Michigan | FCA Dealership | July 2013 | Marketing Documents for 2014 Ram 1500 Vehicles. |
| EPA | FCA | September 2013 | COC and related documents for 2014 Jeep Grand Cherokee. |
| EPA | FCA | September 2014 | COC and related documents for 2015 Jeep Grand Cherokee. |

| FCA Warren Truck Assembly | Arrigo Dodge Dealership, Sunrise, Florida | November 2015 | Shipment of 2016 Ram 1500 Vehicles. |
|---|---|---|---|

204.   The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| Bosch LLC | RP Newswire, New York (and media networks around United States) | January 2013 | Press release that Bosch's "clean diesel" technology will be featured in 2014 Jeep Grand Cherokee. |
| FCA, Michigan | Driving Public Throughout all 50 States | July 2013 | Ram Zone Blog: *The 2014 Ram 1500 with Eco Diesel Engine, Available Soon at a Dealer Near You.* |
| Bosch LLC | FCA | October 2013 | Software and calibration documentation for emission control technology. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2014 | Certification Summary Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram 1500. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2015 | Certification Summary Information Report with emission test results for 2015 Jeep Grand Cherokee and 2015 Ram 1500. |
| FCA, Michigan | EPA Washington, DC | February 2, 2016 | Email correspondence re: FCA lulling press release concerning compliance of diesel |

| | | | vehicles with applicable emission regulations. |
|---|---|---|---|
| EPA, Washington, DC | FCA, Michigan | November 30, 2016 | Email correspondence re: conference call between EPA officials and Sergio Marchionne. |

205.     The RICO Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities. Specifically, FCA, under the direction and control of Fiat made misrepresentations about the Fraudulent Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics.

206.     The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

207.     The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Fraudulent Vehicles, which RICO Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Fraudulent Vehicles were "clean" diesel cars.

208.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of

communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

209.     The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the RICO Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

210.     The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

211.     To achieve their common goals, the RICO Defendants hid from the general public the excessive and unlawful emissions of the Fraudulent Vehicles and obfuscated the true nature and level of the emissions even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the concealed auxiliary (or defeat) devices present in the Vehicles.

212.     With knowledge and intent, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Fraudulent Vehicles (and the emission control technology contained therein).

213.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics. Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Vehicles.

214.    The RICO Defendants knew and intended that government regulators would rely on their material omissions made about the Fraudulent Vehicles to approve them for importation, marketing, and sale in the United States and each state. The RICO Defendants knew and intended that consumers would purchase the Fraudulent Vehicles and incur costs as a result. Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that they purchased illegal and defective vehicles that never should have been introduced into the U.S. stream of commerce. In concealment and omissions made or caused to be made by the RICO Defendants; otherwise, FCA could not have obtained valid COCs and EOs to sell the Vehicles.

215.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs based on their misrepresentations and omissions, while providing Fraudulent Vehicles that were worth significantly less than the purchase price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

216.    The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the EcoDiesel® RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved

55

obtaining Plaintiffs' funds and avoiding the expenses associated with remediating the Fraudulent Vehicles.

217.    During the design, manufacture, testing, marketing and sale of the Fraudulent Vehicles, the RICO Defendants shared among themselves technical, marketing, and financial information that revealed the existence of the AECDs contained therein. Nevertheless, the RICO Defendants chose and agreed to disseminate information that deliberately misrepresented the Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient" in their concerted efforts to market and sell them to consumers.

218.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs have been injured in their business and/or property in multiple ways, including but not limited to:

A.    Purchase or lease of illegal, defective Fraudulent Vehicles;

B.    Overpayment at the time of purchase or lease for Fraudulent Vehicles purportedly having "EcoDiesel" properties and benefits, and meeting applicable federal and state emissions standards, that did not have these properties or meet these standards;

C.    The value of the Fraudulent Vehicles has diminished;

D.    Other, ongoing out-of-pocket and loss-of-use expenses;

E.    Payment for alternative transportation; and

F.    Loss of employment due to lack of transportation.

219.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' business and property, and Plaintiffs are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## STATE LAW CLAIMS

## TEXAS COUNT 1-
## FRAUD

220.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

221.    As alleged extensively above, Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Fraudulent Vehicles in order to defraud and mislead Plaintiffs about the true nature of the Fraudulent Vehicles.  Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the  Cheat Devices  in the Fraudulent Vehicles that caused the vehicles to operate in a low-emission test mode only during testing. During normal operation and use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants, up to 20 times the legal limit. The result was precisely what Defendants had intended—the Fraudulent Vehicles were able to "pass" emission testing by way of deliberately-induced false readings and thus successfully imported and sold and/or leased to unwitting American consumers.

222.    Defendants valued their profits over the trust that Plaintiffs entrusted to them. Plaintiffs acquired diesel cars from Defendants because they believed they were "clean" diesel cars.

223.    Necessarily, Defendants also took steps to ensure that their employees did not reveal the details of their scheme to regulators or consumers, including Plaintiffs. Defendants did so to falsely assure purchasers and lessors of the Fraudulent Vehicles, including previously-owned vehicles, that Defendants are reputable and comply with applicable law, including federal and state clean air laws and emission regulations, and that the Fraudulent Vehicles likewise comply with applicable laws and regulations.

224.    Defendants' false representations and omissions were material to Plaintiffs, as they concerned both the legality and core marketing features of the Fraudulent Vehicles.  As Defendants well knew, Plaintiffs highly valued that the vehicles they were acquiring were "clean" diesel cars, and they paid a premium accordingly.

225.    Each Defendant committed fraud by designing, installing and calibrating the Cheat Devices in the Fraudulent Vehicles (as well as aiding and abetting such), which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Fraudulent Vehicle, the Fiat Chrysler Defendants concealed from Plaintiffs that the emission treatment technology de-activated under real-world driving conditions.  Fiat Chrysler intentionally concealed, suppressed, and failed to disclose the facts that the Fraudulent Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. Fiat Chrysler also false represented the performance of the Fraudulent Vehicles.   These Defendants, along with VM Motori and Bosch, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Fraudulent Vehicles.  And yet, at no time did any of these Defendants reveal the truth to Plaintiffs. To the contrary, each Defendant concealed the truth, intending for Plaintiffs to rely— which they did.

226.    Plaintiffs reasonably relied on Defendants' deception, and Defendants intended that they would so rely. Plaintiffs had no way of discerning that Defendants were, in fact, deceiving them because the Cheat Devices were extremely sophisticated technology and could not be discerned by regulators, much less consumers.  A reasonable consumer would not have expected that the emission treatment technology in the Fraudulent Vehicles de-activated under real-world driving conditions or that the Fraudulent Vehicles would spew unmitigated NOx during city or

highway driving.  Plaintiffs did not, and could not, unravel Defendants' scheme on their own. In fact, it took years before the engineering community, the EPA, and CARB, among others, detected the discrepancy of the emissions spewed from the Fraudulent Vehicles using sophisticated, expensive equipment and applying decades of combined experience. And even then, Defendants continued to conceal their fraud.

227.    Defendants' devious scheme to design and install defeat device software in the Fraudulent Vehicles for the specific purpose of falsely representing to Plaintiffs and U.S. consumers that the Fraudulent Vehicles complied with emissions laws and were "green" environmentally friendly vehicles, and then concealing their fraudulent scheme through numerous model years, reveals a corporate culture that emphasized sales and profits over integrity. Further, it demonstrates a callous disregard for not only the rule of law but also Defendants' customers, including Plaintiffs.

228.    Defendants had a duty to disclose the Cheat Devices to Plaintiffs.

229.    Defendants hatched the deceptive scheme and knew that customers, including Plaintiffs, did not know about (and could not reasonably discover) their scheme.

230.    Defendants not only concealed the illegal Cheat Devices, which posed a safety harm, but went further to make numerous affirmative misrepresentations about the quality and characteristics of the Fraudulent Vehicles as "Clean Diesel" vehicles. As set forth above, Defendants did so through its advertising, press releases, statements by corporate executives, and their websites, among other sources.  Defendants' statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by Defendants such as the "window sticker", vehicle brochure, and

other public statements, documents and advertisements provided to or otherwise made available to Plaintiffs.

231.     Each of these misrepresentations, at the time they were made, concerned either a past or then-existing material fact, and were made intentionally and knowingly, with an intent to mislead. Having "opened their mouth" to claim the Fraudulent Vehicles were "clean," Defendants had the duty to come clean about the dirty defeat devices – but they failed to do so.

232.     Defendants actively concealed the defeat devices and actual emission levels of the Fraudulent Vehicles to pad their profits and avoid the perception that the Fraudulent Vehicles did not comply with federal and state laws governing clean air and emissions. Defendants engaged in this fraudulent concealment at the expense of Plaintiffs.

233.     Plaintiffs reasonably relied upon the misrepresentations detailed herein, including the fraudulent concealment of the Cheat Device, in purchasing or leasing the Fraudulent Vehicles.

234.     Plaintiffs were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had regulators or the driving public known the truth—Defendants would not have been able to obtain COCs or EOs for the sale of the Fraudulent Vehicles and as a consequence Plaintiffs would never have acquired the Fraudulent Vehicles in the first place.

235.     As a direct and proximate result of Defendants' fraudulent scheme, Plaintiffs sustained damages. They acquired Fraudulent Vehicles that are non-compliant and severely diminished in value as compared to the vehicles that were advertised and marketed.  Moreover, the Fraudulent Vehicles either cannot be repaired to comply with applicable emissions standards, or if they can be made compliant, their performance, fuel efficiency, and longevity will be compromised.

236.     Defendants are liable to Plaintiffs for actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, mental anguish and emotional distress) in an amount to be proven at trial, for which Plaintiffs hereby sue Defendants. Plaintiffs further seek to recover the full purchase price of the vehicle, or, alternatively the diminished value of the vehicle (the difference at the time of purchase between the value of the Vehicle as accepted and the value the Vehicle would have had if it had been as advertised, warranted or represented).  Defendants, as set forth herein, are guilty of oppression, fraud, and malice, express or implied in the Deceptive Emissions Scheme, including the Cheat Device.  Defendants' conduct thus warrants the award of substantial punitive and exemplary damages in an amount to be determined at trial, for which Plaintiffs hereby sue Defendants.

## TEXAS COUNT 2-
## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES
## ACT – CONSUMER PROTECTION ACT
### (Tex. Bus. & Com. Code §§ 17.41, et seq.)

237.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

238.     Plaintiffs bring this count against all Defendants.

239.     Plaintiffs are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see TEX. BUS. & COM. CODE § 17.41, and are therefore "consumers" pursuant to TEX. BUS. & COM. CODE § 17.45(4).

240.     Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

241.     Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning TEX. BUS. & COM. CODE § 17.46(a).

242.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA")
prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or
commerce," TEX. BUS. & COM. CODE § 17.46(a), and an "unconscionable action or course of
action," which means "an act or practice which, to a consumer's detriment, takes advantage of the
lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."
TEX. BUS. & COM. CODE §§ 17.45(5) and 17.50(3).  The Texas DTPA further prohibits (1) causing
confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or
services; (2) representing that goods or services have sponsorship, approval, characteristics,
ingredients, uses, benefits, or quantities which they do not have; (3) representing that goods or
services are of a particular standard, quality, or grade, or that goods are of a particular style or
model, if they are of another; (4) advertising goods or services with intent not to sell them as
advertised; and (5) failing to disclose information concerning goods or services which was known
at the time of the transaction if such failure to disclose such information was intended to induce
the consumer into a transaction into which the consumer would not have entered had the
information been disclosed.  TEX. BUS. & COM. CODE §§ 17.46(b)(2), (5), (7), (9) (24).  Defendants
knowingly and intentionally violated all of the aforementioned provisions of the Texas DTPA.

243.    Plaintiffs further contend that Defendants' violations of the Texas DTPA were
committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of
the Texas DTPA.

244.    In the course of Defendants' business, Defendants intentionally or negligently
concealed and suppressed material facts concerning the true emissions produced by the misnamed
"EcoDiesel" engines in the Fraudulent Vehicles. Defendants accomplished this by installing illegal
defeat device software in the Fraudulent Vehicles that caused the vehicles to operate in a low

emission test mode only during emissions testing. During normal operations, the Fraudulent Vehicles would emit grossly larger quantities of noxious contaminants, sometimes 20 times over applicable standards. The result was what Defendants intended—the Fraudulent Vehicles passed emissions testing by way of deliberately induced false readings. Plaintiffs had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs did not and could not unravel Defendants' deception on their own. In fact, it took years before the engineering community and regulators detected the Cheat Devices using sophisticated, expensive equipment and applying decades of combined experience.

245. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Texas DTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing their vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting themselves as reputable and valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold. Defendants compounded the deception by repeatedly asserting that the Fraudulent Vehicles were safe, reliable, environmentally clean, efficient, and of high quality.

246. Defendants knew they had installed the Cheat Devices in the Fraudulent Vehicles, and knew the true nature of the "clean" diesel engine system for years, but concealed all of that information. Defendants also knew that they valued profits over environmental cleanliness, efficiency, and compliance with the law, and that they were designing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but they concealed this information as well.

247.     Defendants intentionally and knowingly misrepresented material facts regarding the Fraudulent Vehicles with intent to mislead Plaintiffs.

248.     Defendants knew or should have known that their conduct violated the Texas DTPA.

249.      Defendants owed Plaintiffs a duty to disclose truthfully all the facts concerning the cleanliness, efficiency and reliability of the Fraudulent Vehicles because they:

   a.     possessed exclusive knowledge that they were designing, manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

   b.     intentionally concealed the foregoing from Plaintiffs; and/or

   c.     made incomplete or negligent representations about the environmental cleanliness and efficiency of the Fraudulent Vehicles generally, and the use of the Cheat Device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

250.     Defendants concealed the Cheat Devices and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once their fraud was exposed.  The value of the Fraudulent Vehicles has therefore plummeted.  In light of the stigma Defendants' misconduct attached to the Fraudulent Vehicles, the Fraudulent Vehicles are now worth less than they otherwise would be worth.

251.     Defendants' supply and use of the illegal Cheat Devices and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals their polluting engines rather than promptly remedying them.

252.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental

cleanliness and efficiency of the Fraudulent Vehicles, the quality of the Defendants' brands, the devaluing of environmental cleanliness and integrity of Defendants, and the true value of the Fraudulent Vehicles.

253.    Plaintiffs suffered ascertainable loss and actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, humiliation, inconvenience, mental anguish and emotional distress) as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs who acquired the Fraudulent Vehicles would not have acquired them at all and/or—if the Fraudulent Vehicles' true nature had been disclosed and mitigated, and the Fraudulent Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

254.    Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.

255.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

256.    Pursuant to TEX. BUS. & COM. CODE § 17.50, Plaintiffs seek economic damages, additional damages for knowing and intentional violations of the Texas DTPA, mental anguish damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA. Plaintiffs further seek to recover the full purchase price of the vehicle, or, alternatively the diminished value of the Vehicle (the difference at the time of purchase between the value of the Vehicle as accepted and the value the Vehicle would have had if it had been as advertised, warranted or represented).

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants, as follows:

A.     Economic damages, non-economic damages (including, without limitation, damages for emotional distress, embarrassment, humiliations, and mental anguish), and disgorgement of Defendants' profits or unjust enrichment in an amount to be determined at trial;

B.     Statutory damages;

C.     Rescission of the contracts for sale or lease;

D.     Punitive and additional damages;

E.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F.     An award of costs and attorneys' fees; and

G.     Such other or further relief as may be appropriate.

Respectfully submitted,


*/s/ Michael Heygood*
MICHAEL E. HEYGOOD
State Bar No. 00784267
michael@hop-law.com
ERIC D. PEARSON
State Bar No. 15690472
eric@hop-law.com
CHARLES W. MILLER
State Bar No. 24007677
charles@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Hwy 161, Ste. 450
Irving, TX 75038
(214) 237-9001
(214) 237-9001 (FAX)

**ATTORNEYS FOR PLAINTIFFS**